**EXHIBIT A**

**STATEMENT OF FACTS**

This Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement ("the Agreement") between the U.S. Attorney's Office for the Southern District of California (the "USAO") and Colas Djibouti SARL ("Colas Djibouti"). The parties agree and stipulate that the following facts are true and accurate, and if this case had proceeded to trial, the United States would have proved these facts beyond a reasonable doubt. As set forth in Paragraph 3 of the Agreement, Colas Djibouti admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, and agents as follows:

1. Between 2012 to mid-2014 ("the relevant period"), Colas Djibouti, a wholly-owned subsidiary of Colas, S.A., operated in the Republic of Djibouti as a contractor and subcontractor to the United States, providing and laying concrete.

2. Colas Djibouti held the following contracts and subcontracts to provide concrete to the United States Department of Defense and the Department of State at Camp Lemonnier, Chabelley Airfield, and the U.S. Embassy in the Republic of Djibouti:

| # | Contract Number | Project Name |
|---|---|---|
| 1 | N62470-13-C-3001 | Task Force Compound |
| 2 | N33191-09-D-0120 | Aircraft Apron/Taxiway and Maintenance Shelter |
| 3 | N33191-09-D-0119 | Fuel Farm |
| 4 | N33191-13-D-0843 | Aircraft Maintenance Hangar/Telecom Facility |
| 5 | N33191-12-D-0616 | Taxiway Ramp |
| 6 | N33191-12-C-0614 | Deployed Billeting and Expeditionary Lodging |
| 7 | N62470-06-D-6009 | SOCCE Expansion |
| 8 | N62470-12-C-2008 | Combat Aircraft Loading Area |
| 9 | N62470-12-C-2008 | Taxiway Extension and Ammunition Supply Point |
| 10 | SDJ1001-3-C-0012 | Prime Contractor for Warehouse Fencing and Concreting |
| 11 | N62470-15-C-5000 | Unaccompanied Housing |
| 12 | N62470-13-C-3016 | Galley Addition |
| 13 | N33191-10-C-0226 | SOCCE CLUs |
| 14 | N62470-13-C-3001 ("Project 688") | Forward Operating Site |

3. These contracts specified requirements for the ingredients, composition, and characteristics of the concrete to be provided by Colas Djibouti, including alkali-silica reactivity, aggregate grading and size, water chloride concentration, resistance, and for the U.S. Embassy contract, concrete thickness.

4. Colas Djibouti maintained a laboratory certified by the United States Army Corps of Engineers ("USACE") to test for certain of the contracts' specifications and certify that the ingredients, mix design, and the resulting concrete complied with those contract specifications. Specialized testing that Colas Djibouti was not certified to perform, like alkali-silica reactivity testing, was to be outsourced to a third-party laboratory.

2                                                      Def. Init.

5. Notwithstanding its obligations to test and certify its concrete's compliance with contract specifications, Colas Djibouti created fictitious test results, made fraudulent representations regarding its concrete's composition, and knowingly provided cheaper, noncompliant concrete to the United States that did not comply with the relevant contractual specifications.

6. As a representative example, Colas Djibouti obtained third-party testing of the alkali-silica reactivity of the aggregate it intended to use for Contracts 2, 3, 4, & 5. Though the tests indicated that the aggregate was alkali-silica reactive, the Colas Djibouti laboratory staff did not mitigate the alkali-silica reactivity with fly ash, and as a result, knowingly created out-of-specification concrete mix designs and provided the noncompliant concrete to the United States.

7. With respect to Contracts 1 & 4, the Colas Djibouti laboratory staff created fictitious alkali-silica reactivity test results, spuriously indicating compliance with the contract specifications. Despite knowing the alkali-silica reactivity test results were fictitious, senior Colas Djibouti employees approved submitting the test results as bona fide.

8. With respect to Contracts 1, 2, 4, 6, & 8, Colas Djibouti laboratory staff fabricated test results showing that the aggregate size complied with the contracts' specifications despite knowing Colas Djibouti's equipment was incapable of producing the specified aggregate sizes. For each contract, Colas Djibouti knowingly supplied noncompliant concrete to the United States.

9. With respect to Contract 5, Colas Djibouti submitted a concrete mix design, which it represented was compliant with the

Def. Init. ⎤

1 contract's aggregate specifications, despite knowing that that
2 representation was fraudulent and that it could not produce the
3 required aggregate sizes. For this contract, too, Colas Djibouti
4 knowingly supplied noncompliant concrete to the United States.

5     10. For Contracts 1, 4, 5, 6, & 8, the water Colas Djibouti
6 used for its concrete mix designs contained chloride
7 concentrations in excess of the contracts' specifications, and
8 Colas Djibouti knowingly provided the resulting noncompliant
9 concrete to the United States. In one instance, in response to a
10 request for an analysis of the water used in the mix design, the
11 Colas Djibouti laboratory staff, at the direction of Colas Djibouti
12 management, provided an analysis of bottled water. The laboratory
13 staff, however, did not indicate on the analysis that they had
14 tested bottled water rather than the water used in the mix design.
15 Colas Djibouti's management then authorized the laboratory staff
16 to provide the misleading water analysis.

17     11. With respect to Contract 5, the Colas Djibouti
18 laboratory staff, at the direction of Colas Djibouti management,
19 falsified a concrete mix design that misrepresented the water-to-
20 cement ratio used. The actual ratio used was not in compliance
21 with the contract's specifications, but Colas Djibouti knowingly
22 supplied the resulting noncompliant concrete to the United States.

23     12. With respect to Contract 6, the Colas Djibouti
24 laboratory staff, at the direction of Colas Djibouti management,
25 fabricated compressive strength test results purporting to verify
26 that the required concrete resistance had been achieved.

27     13. Likewise, with respect to Contract 10, Colas Djibouti
28 laboratory staff, at the direction of Colas Djibouti management,

fabricated test results purporting to verify that the specified compressive strength had been achieved. For this contract, too, Colas Djibouti knowingly supplied noncompliant concrete.

14. As a result of its fraudulent conduct, for each of Contracts 1-13, as set forth above, Colas Djibouti provided noncompliant concrete containing, in whole or in part: (1) aggregate that did not meet gradation requirements; (2) excessive alkali-silica reactive material; and (3) elevated chloride content. These conditions could promote early-age cracking, surface defects, and the corrosion of embedded steel, and thus, significantly impair the concrete's long-term durability.

15. For the purposes of executing the scheme to defraud the United States of money and property by means of material false statements and representations, defendant and its conspirators transmitted and caused to be transmitted by wire various emails and invoices in interstate and foreign commerce.

16. A substantial part of the fraudulent scheme was committed in Djibouti, outside the United States, and as part of the scheme, Colas Djibouti intentionally engaged in sophisticated conduct, including creating fictitious test results and making fraudulent representations regarding its concrete's composition.

17. As a result of the fraudulent scheme, Colas Djibouti caused loss to the United States of at least $10,042,002.

Def. Init.